Hope C. Lefeber, Esquire
I.D. No. 31102
Hope C. Lefeber, LLC
Two Penn Center
1500 JFK Boulevard; Suite 1205
Philadelphia, PA   19102
(610) 668-7927                                              Attorney for Defendant

_____

**IN THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF
PENNSYLVANIA**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | Criminal No. 23-159 |
| DENISE LODGE | : | |


**SENTENCING MEMORANDUM
OF
<u>DEFENDANT DENISE LODGE</u>**


This Sentencing Memorandum is respectfully submitted on behalf of Denise Lodge who is scheduled to be sentenced by this Court on December 16, 2025.  Ms. Lodge pled guilty to Count 5 of an Indictment charging her with Interstate Transportation of Stolen Goods, Aiding and Abetting, in violation of 18 U.S.C. §§2314 and 2.


**I.        INTRODUCTION**

Denise Lodge stands before the Court as a 65-year-old woman with no prior criminal history, who has endured a lifetime of extreme hardship, from childhood abandonment,

emotional abuse, trauma, serious illness, to caring for her loved ones who struggle with disabilities. Ms. Lodge has, nevertheless tried, for decades, to build a quiet, respectable, and ordinary life. She has no prior criminal history. She has spent her adult years working, caring for her family, and fighting a devastating series of medical conditions, including metastatic cancer, that has ravaged her body and left her physically and emotionally depleted.

It was only after Denise became so sick with Stage IV breast cancer that she could no longer work, and the family's finances began to collapse, that her husband, Cedric Lodge, turned to the criminal conduct at issue. As their income dwindled and Denise's medical needs increased, Cedric came up with a plan to sell human remains. Denise initially refused. She told him she did not want to be involved. But she was physically exhausted, emotionally worn down, and increasingly dependent on him as her caregiver. He persisted, and she simply did not have the strength, while battling metastatic cancer, multiple other illnesses, and the overwhelming fear of financial ruin—to stand up to him. In that vulnerable state, she acquiesced.

None of this excuses her conduct. Denise knows that what she did was wrong. She has accepted responsibility, and she will live with the shame of this offense for the rest of her life. But her actions occurred in the shadow of life-altering illness, financial collapse, and a marriage transformed by disability and dependence. Understanding her circumstances is essential to understanding how a woman with no criminal history, a decades-long work record, and a lifetime of caretaking could have ended up in this position.

A non-custodial sentence that considers her humanity, her lifelong struggles, her serious and ongoing medical conditions, her caregiving responsibilities, and her genuine remorse will be

"sufficient but not greater than necessary" to satisfy the goals of sentencing under 18 U.S.C. § 3553(a).

## II.    <u>PERSONAL BACKGROUND</u>

### A.    Early Life and Childhood Trauma

The Presentence Investigation Report shows a woman whose life has been shaped by suffering: abandoned at birth by a drug-addicted teenage mother, raised in an emotionally barren and punitive household, and thrust into adult responsibilities far too young (*PSR ¶¶41–42*). Yet she persevered. She earned her GED, put herself through college, and worked steadily for years—until cancer ended her ability to earn a living.

As the Presentence Investigation Report reflects, Ms. Lodge's life began with profound instability. She was born in 1960 in Brockton, Massachusetts to a fifteen-year-old drug-addicted mother who abandoned her at birth.  Denise was placed into foster care, later adopted by Thomas and Jane Collins. Her adoptive mother struggled with alcoholism, and her father rigidly enforced discipline, often with corporal punishment. Denise told the probation office that her childhood was marred by constant abuse and that she felt that she could "never do anything right". Her household was characterized by alcoholism, strictness, and physical punishment (*PSR ¶¶41–42*).

By age 15, she was responsible for the care of her younger siblings, denied a normal adolescence, and overwhelmed by her home environment. She ran away for the first time at 15 and permanently left home at 17 after her foster father used a racist slur toward one of her friends (*PSR ¶¶42, 41–42*). She has remained estranged from her foster father but ultimately cared for the person who took her in when she left home, inviting him to live with her until his death. (*PSR*

3

¶¶*41–42*).  These unaddressed childhood traumas—abandonment, emotional neglect, and physical discipline formed the foundation of her adult vulnerability and her lifelong pattern of prioritizing others over herself.

Despite these early traumas, she worked hard to build a stable life, obtained her GED, pursued two college programs—ultimately earning a bachelor's degree in management and accounting and developed a long, steady work history before becoming disabled due to metastatic cancer (*PSR ¶¶54–57, 58*).

As a young adult, Ms. Lodge entered a long-term relationship with Frank Hooks and legally changed her name to Denise Hooks in 1980, although the relationship ultimately ended, and her contact with him ceased (*PSR ¶43*). Denise became a single mother to Desha, who has lifelong developmental disabilities. Desha, now 45, has delayed intellectual functioning and the "mentality of a 16-year-old" and lives on Social Security Disability benefits (*PSR ¶44*). This early period of Ms. Lodge's adulthood was marked by hardship and the responsibility of caring for a child with special needs, largely on her own. She was an extraordinarily devoted mother and, as her friend Gail Webber writes, "nothing would deter her from doing what was best for her child." *Letter of Gail Webber*, Exhibit "A."

### B.    Marriage and Caretaking Role

In 2001, Ms. Lodge married Cedric Lodge. Their marriage was positive and supportive for many years, but it has now transitioned into a caretaking relationship as Cedric has suffered several strokes, lost 70% of his vision, and is showing signs of dementia (*PSR ¶45*). As the PSR notes, Ms. Lodge is now effectively his primary caregiver, managing his cognitive decline and

physical impairments.  This, however, is extremely difficult for her as she is dealing with constant doctor's appointments, pain, weakness and sickness as a result of her Stage IV cancer. The couple has lived in Manchester, New Hampshire, for more than two decades, and remain in their longtime home (*PSR ¶46*).

### C.    Education and Employment

Despite her difficult upbringing, Ms. Lodge worked hard to improve her life. She withdrew from high school in the 10th grade due to instability at home but earned her GED in 1979 (*PSR ¶54–55*). She later completed 83 credits at North Shore Community College (*PSR ¶56*), and ultimately earned a Bachelor of Science in Management and Accounting from the University of Massachusetts Boston in 1998 (*PSR ¶57*).

Her employment history reflects steady, meaningful work over many years:

- Technical support data analyst at MITRE (2000–2005) supporting Air Force contracts,
- Planning analyst for New Hampshire DHHS (2011–2014),
- Data analyst for SAIC/Leidos (2007–2015) earning $80,000 annually (*PSR ¶¶58–61*).

This stable work history ended only when her health deteriorated. She has been on Social Security Disability since 2015 due to metastatic cancer (*PSR ¶58*).

### D.    Medical Hardships

Denise's medical challenges are overwhelming and she has been fighting for her own survival for more than twenty years now.  She was diagnosed with breast cancer in 2003 and when it recurred in 2007, underwent bilateral mastectomy. In 2015, she received the devastating

news that the cancer had metastasized to her lungs, liver, lymph nodes, and bones. In addition to metastatic cancer, she suffers from asthma, cardiomyopathy, emphysema, diabetes, hepatitis C with cirrhosis, osteoarthritis, recurrent infections, and numerous other serious conditions documented in the PSR (*PSR ¶49*). She has undergone numerous surgeries including lung tumor excision, mastectomy, cholecystectomy, appendectomy, knee arthroscopy, and more.
She takes multiple medications and receives regular care from her physicians (*PSR ¶49*). She also experiences anxiety related to the offense but otherwise maintains stability through prescribed medication (*PSR ¶51*).

Her declining health, combined with exhaustion, pain, and emotional depletion, left her uniquely susceptible to pressure at the time of the offense.

### III.    THE SENTENCING GUIDELINES AND OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT ("PSR")

The defense agrees that the base offense level is 6. (PSR¶29).  For the reasons below, we object to the two enhancements set forth at PSR ¶¶31 and 32.  Therefore, after the adjustments set for at PSR ¶¶38 and 39, the Total Offense Level is 2.

#### A.    Objection to §2B1.1(b)(2)(A)(ii) Enhancement for Commission of the Offense By Mass-Marketing, (PSR¶31)

The defense objects to this enhancement for the commission of the offense through mass-marketing.  Commentary, n. 4. **Application of Subsection (b)(2) provides:**

(A) **Definition.**  For purposes of subsection (b)(2), "***mass-marketing***" means a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of

6

persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit. "Mass-marketing" includes, for example, a telemarketing campaign that solicits a large number of individuals to purchase fraudulent life insurance policies.

The error in the application of this enhancement lies in the fact that it is mass marketing to victims that is the subject of this enhancement – the enhancement relates only to the solicitation of victims through mass-marketing, not defendants!  No victims were solicited through mass-marketing in this case.  As the Second Circuit in *United States v. Lacey*, 699 F. 3d 710 (2d Cir. 2012) stated:

> As at least one other Circuit has recognized, an offense is "committed through mass-marketing" when mass-marketing is used to recruit or deceive *victims* of the offense, not when mass-marketing targeted at audiences other than victims is used in connection with the fraud in some other, more tangential manner. *See United States v. Miller,* 588 F.3d 560, 568 (8th Cir.2009). It is not enough that a scheme may be *advanced by* the use of mass marketing * techniques; a scheme is *committed through* mass-marketing only when the mass marketing is directed toward individuals who will be harmed by the scheme.
> *Id.* at pp.714–15 (citations omitted).

Clearly, this enhancement relates only to mass-marketing to victims.  There is no precedent for applying this enhancement where defendants use a Facebook group and Facebook Messenger to recruit participants and to communicate, and none is cited.  *See also, United States v. Herlihy*, 336 F.R.D. 217, 236 (D.C. New Mexico 2020).

Moreover, a Facebook group or Facebook Messenger does not even constitute "mass-marketing." A Facebook group is a targeted or semi-private forum wherein the membership is self-selected by people who affirmatively join.  Communications are within group members, not the general public.  Communications confined to a self-selected, restricted membership group do not meet the definition of mass-marketing. Lastly, there is

no evidence in this case as to the number of participants in this Facebook group; it is likely less than 10 or 20 people.

For all of these reasons, the defendant's objection to the enhancement under §2B1.1(b)(2)(A)(ii) should be sustained.

**B.    Objection to Enhancement under §2B1.1(b)(4) for Being in the Business of Selling Stolen Property (PSR ¶32)**

This enhancement is not applicable to codefendants who sell merchandise that another coconspirator stole, as in this case.  As the Circuit Court in *United States v. Nicolescu*, 17 F. 4th 706, 722 (6th Cir. 2021) held:

> Accordingly, § 2B1.1(b)(4) is limited in its application to professional fences—it does not apply to thieves who merely sell goods they stole. Our sister circuits have almost unanimously reached the same conclusion. *See, e.g.*, *723 United States v. Borders*, 829 F.3d 558, 568 (8th Cir. 2016); *Vigil*, 644 F.3d at 1118; *United States v. Bradley*, 644 F.3d 1213, 1287 (11th Cir. 2011); *Kimbrew*, 406 F.3d at 1152; *McMinn*, 103 F.3d at 219–21; *United States v. Sutton*, 77 F.3d 91, 94 (5th Cir. 1996); *United States v. Braslawsky*, 913 F.2d 466, 468 (7th Cir. 1990) (coming to same conclusion about prior version of the enhancement, § 2B1.2(b)(3)(A)). *But see United States v. Collins*, 104 F.3d 143, 144 (8th Cir. 1997) (holding that a thief was "in the business" of receiving and selling stolen property when he delivered goods he had stolen to an auction house and split the proceeds with the auction house after the goods were sold).

There is no dispute in this case that the human remains were obtained by Cedric Lodge from Harvard Medical School and were subsequently sold by him and Denise Lodge.  Clearly, they sold the goods that Cedric Lodge obtained and, therefore, this enhancement is inapplicable.

**C.    Total Offense Level**

For all of the reasons set forth above, the enhancements set forth in PSR ¶¶31 and 32 are inapplicable and the Total Offense Level is 2.

**IV.    RELEVANT SENTENCING FACTORS**

District courts possess "broad discretion in imposing a sentence within a statutory range." *United States v. Booker*, 543 U.S. 220, 233, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), 125 S. Ct. 738; *United States v. Folk*, 954 F.3d 597, 605 (3d Cir. 2020). When sentencing a defendant, the court must consider the applicable Guidelines offense level, which is advisory, and the factors enumerated in Title 18, United States Code, Section 3553(a).[3] *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Folk*, 954 F.3d 597, 605 (3d Cir. 2020). The advisory Guidelines are the "starting point and the initial benchmark for sentencing." *Beckles v. United States*, ⸺ U.S. ⸺, 137 S. Ct. 886, 894, 197 L.Ed.2d 145 (2017) *Id.* at 894 (quoting *Gall*, 552 U.S. at 49, 128 S.Ct. 586 (internal quotation marks omitted)). A sentencing court may not rely exclusively on the Guidelines range; rather, the court must make an individualized assessment based on the facts presented and the other statutory factors." *Id.* at 894 (quoting *Gall*, 552 U.S. at 49, 128 S. Ct. 586 (internal quotation marks omitted)). The sentence imposed must be "sufficient, but not greater than necessary" to comply with the purposes set forth in Section 3553(a)(2). 18 U.S.C. § 3553(a).

**A.    <u>The Nature and Circumstances of the Offense</u>**

The offense in this case occurred against a backdrop of financial collapse, illness, and desperation. Denise Lodge's involvement must be understood within the fragile circumstances of her life during the relevant period, and the profound pressure she was experiencing from her deteriorating medical condition, her inability to work, and the resulting financial decline.

Until 2015, Denise had been a steady, reliable wage earner. She worked for decades in professional positions and supported the household financially. But after her metastatic cancer diagnosis and a series of debilitating treatments, she could no longer work. In 2016, she went on disability. Overnight, the household lost its primary source of income. Money became desperately tight. Denise and Cedric struggled to pay the rapidly increasing medical bills, mortgage, utilities, and day-to-day expenses. Denise wanted to move somewhere more affordable, somewhere quieter and easier to manage. Cedric refused. This disagreement caused strain in the marriage and magnified the stress and uncertainty already weighing heavily on them.

Cedric worked at Harvard Medical School for many years. As finances collapsed, Cedric, who knew that Harvard discarded human bones, came up with the fateful idea to take those bones and sell them in Salem where there was a market for human bones.  At the same time, Harvard was discarding certain anatomical materials: disposing of bones, allowing students to keep non-identifiable specimens, and placing others in medical waste to be cremated. To Cedric, who was desperate as his wife grew sicker and feeling the pressure of mounting bills, this looked like an opportunity.  When Cedric first raised this idea, Denise wanted no part of it. She objected immediately and forcefully. She told him she did not want the bones in her house, did not want to be involved, and wanted him to drop the idea entirely.  this led to a major argument between them, one that reflected their deteriorating financial stability, their conflicting desires about relocating, and the immense pressure they were both under. Denise was sick, exhausted, and frightened about their future. Cedric insisted that this was a way to generate money to keep them afloat. He explained to Denise that the human remains were already dissected specimens that were going to become medical waste.

Initially, Denise held her ground at first. She refused to help. She told him no. But as time went on, and as her cancer treatments intensified, she became physically and emotionally depleted. She was too sick to work, too weak to manage household responsibilities, and too dependent on Cedric for daily functioning to continue fighting him.  Eventually, worn down by illness, fatigue, and fear of losing their home, she relented. She did not mastermind the scheme, initiate it, or desire it. She succumbed, reluctantly and regretfully, because she no longer had the strength to resist.  Unlike all other defendants, her role was limited and she was not involved for the entire period.

Denise's role in the offense was limited to taking some orders, mailing packages processing payment through paypal.  The prices were set by Cedric.  She is, by far, the least culpable defendant in this case. Her conduct is an aberration in a life otherwise marked with integrity, compassion and caregiving.

### B.    <u>History and Characteristics of the Defendant</u>

The letters submitted on Denise's behalf paint a consistent portrait of a compassionate, reliable, generous, and fiercely loyal person.  Denise Lodge's history and characteristics reflect a woman who has spent her entire life caring for others, putting their needs before her own, and showing a level of compassion, loyalty, and service that is rare. Her friends do not speak of isolated acts of kindness, but rather they describe a lifetime of selflessness.

A friend of thirty-three (33) years, Gail Webber, describes her as "one of the finest people I know… kind, loyal, strong, caring, generous." *Letter of Gail A. Webber,* Exhibit "A." Another, Cherie Roberts, writes that Denise is "a once-in-a-lifetime friend," someone who inspires trust and love. *Letter of Cherie Roberts,* Exhibit "A." Elizabeth Weir, another longtime friend,

recounts how Denise took her in, helped during a divorce, and became a "healer of hearts and spirits." *Letter of Elizabeth Weir*, Exhibit "A."  Steven Pomeroy explains that when he was stranded across the country, Denise opened her home to him so that he could return to the East Coast. *Letter of Steven Pomeroy,* Exhibit "A." Others describe her home as a refuge for the sick, the struggling, and the vulnerable.

These accounts reflect a lifelong pattern: Denise lifts people up, never seeking recognition or reward.  Perhaps the most striking theme across every character letter is that Denise has spent her life taking care of anyone who needed her. Gail Webber, her close friend of over three decades, writes that Denise is "one of the most loving, caring people I know" and that "Denise will help anyone in need if she is able." She recounts how Denise raised her daughter Desha alone, navigating the challenges of developmental disabilities, ADD, and serious medical issues. Gail writes that she has "never met a better Mom" than Denise, explaining how Denise fought the Lynn School Board year after year to secure specialized education for Desha because "nothing would deter her from doing what was best for her child"  *Letter of  Gail Webber*, Exhibit "A."

Similarly, John Disario describes how he met Denise during one of the most difficult moments of his life when he was weeks away from homelessness. Despite barely knowing him, she "jumped into action," opened her home, and let him stay "for months without money" until he could get on his feet. He ended up staying eight years with her, and she helped him through his own cancer diagnosis, attending appointments and treatments with him, reading through paperwork, and making sure he was never alone. He writes that she is "one of the nicest, most compassionate, most understanding, most giving people I have ever met," and adds: "There is nobody on this Earth I trust more." *Letter of John Disario*, Exhibit "A."

12

Another friend, Benjamin Hiscock, whose handwritten letter speaks volumes about his gratitude, explains that when he nearly died from COVID-19, Denise and Cedric were at his bedside "every single day," providing hands-on care, including "sponge bathing and grooming me," and never leaving him alone until he was stable enough to return home. He writes that they are "the type of reliable, loving, and kind-hearted people society needs," and that if Denise were to be incarcerated, it would "truly hurt" him, his elderly mother, his developmentally disabled sister, and others who depend on her. *Letter of Benjamin Hiscock*, Exhibit "A."

Denise has housed numerous people over the years: a man who took her in after she ran away from home as a teenager, her husband's cousin and his family, friends fleeing domestic instability, individuals with nowhere else to turn. As John Disario writes, "These are only the instances I know about." He emphasizes that she did all of this "during her battle with breast cancer" and the recurrence that led to a double mastectomy, saying "you would be VERY hard-pressed to find anyone who thinks differently of her." *Letter of John Disario*, Exhibit "A."

The offense conduct stands in stark contrast to who Denise is. The letters make it clear that the people who know her best view this as an aberration, a desperate mistake made during a period of physical decline, financial collapse, and emotional exhaustion. Denise is defined by the people she has lifted up, the families she has supported, the sick she has cared for, and the countless lives she has improved simply by showing up for them. Throughout her entire life Denise held stable professional jobs until metastatic cancer forced her onto disability. She supported her family and everyone who relied on her. She built a life and sought education and employment through grit, discipline, and determination

**C.**    **Acceptance of Responsibility**

Denise Lodge fully accepts responsibility for her actions. She has acknowledged her wrongdoing to the probation officer, to the government, to her family, and to this Court. She has never minimized the seriousness of the offense or attempted to blame others for her decisions. While the PSR notes that she initially struggled to articulate the full extent of her involvement (*PSR ¶35*), this reflected embarrassment, shame, and a deep desire not to relive the events, not a refusal to accept accountability.

She immediately agreed to plead guilty to the Indictment and cooperated with the government from the beginning, even if it meant having to testify against her husband. She understands that her actions were wrong and that they caused pain to the families of the deceased. She carries that weight heavily and speaks about it with genuine sorrow.  Denise is deeply remorseful for her conduct. She has stated repeatedly and unequivocally, that she is ashamed, embarrassed, and horrified by the choices she made. She has cried many times over the thought that families were hurt by what happened. She wishes she could undo what she did and she now carries the emotional weight of her wrongdoing every day.  Her letter to this Court expresses the extent of her shame and remorse.  *Letter of Denise Lodge,* Exhibit "B." Her remorse is humbling, and genuine. It comes from a deep moral understanding that she participated in something that violated her own values, her own sense of compassion, and her lifelong pattern of helping others, not harming them.

### D.    <u>Seriousness of the Offense, Just Punishment and Deterrence</u>

While the offense is undeniably serious, it is necessary to view it against the backdrop of all of the good in Denise Lodge's life, the extraordinary hardships that she has managed and overcome and her otherwise unblemished, law-abiding life with no criminal record. General deterrence is served by this prosecution itself and Denise poses absolutely no risk of reoffending.

Imprisonment would be disproportionately harsh given her terminal illness and extreme frailty and vulnerability. Denise's illness is in its final stages and her days are numbered. The Presentence Investigation Report (*PSR ¶49*) documents an overwhelming number of chronic and serious health conditions layered on top of her metastatic disease. Denise suffers from:

> • **Cardiomyopathy** and **left ventricular desynchrony**, serious cardiac conditions that affect her heart's ability to pump blood effectively
> • **Pulmonary emphysema** and **asthma**, which make breathing difficult and leave her vulnerable to infections and respiratory distress (*PSR ¶49*);
> • **Diabetes mellitus**, which requires ongoing monitoring and complicates healing and immunity (*PSR ¶49*);
> • **Hepatitis C and cirrhosis**, life-threatening liver conditions that affect metabolism, immunity, and energy (*PSR ¶49*);
> • **Kidney calculi**, chronic kidney issues, and recurrent urinary tract infections (*PSR ¶49*);
> • **Osteoarthritis**, causing chronic pain and mobility limitations (*PSR ¶49*);
> • **Neoplasm of uncertain nature** and other nervous system complications (*PSR ¶49*);
> • **Insomnia**, chronic fatigue, and pain that further erode her ability to function normally (*PSR ¶49*).

Denise's daily reality is shaped by her disease. She requires a continuous blood glucose monitor, rescue inhalers, steroid-based inhalers, cholestyramine for gastrointestinal complications, antifungal medications, numerous vitamins, routine radiological studies and regular monitoring by multiple specialists (*PSR ¶49*). She takes Lexapro and Ativan to manage anxiety, which has worsened since the onset of this case (*PSR ¶51*). Even simple tasks such as

walking up stairs, getting out of bed, daily routines, managing medications are exhausting to her. The combined effect of metastatic cancer, compromised lung function, and chronic cardiac issues leaves her fatigued, short of breath, and easily overwhelmed. Some days she cannot complete routine household activities without resting repeatedly. In addition, the emotional impact of Denise's declining health cannot be overstated. She has lived for nearly a decade with the knowledge that her cancer is not curable, only manageable. The fear of progression, the trauma of repeated surgeries, and the exhaustion of constant medical appointments have taken a profound psychological toll. Her anxiety is directly tied to the terrifying uncertainty about her future (*PSR ¶51*).

To incarcerate Denise would be unnecessarily cruel given her terminal illness and extraordinary medical problems. Denise's medical profile places her among the most medically fragile individuals in the criminal justice system. It is unlikely that the prison could appropriately manage her numerous chronic illnesses that require continuous specialized care.  Without any doubt, incarceration would jeopardize her health and survival.

## **CONCLUSION**

In addition to all of the factors mentioned above, Denise's exceptional support of her family, friends and community, immediate and significant acceptance of responsibility, deep remorse and significant personal achievements despite adversity are all substantial mitigating factors weighing in favor of a sentence of probation.

For all of the reasons detailed above, we respectfully submit that a sentence of probation is warranted.

Respectfully submitted,

HOPE C. LEFEBER, LLC

By:

_____
HOPE C. LEFEBER, ESQUIRE

**CERTIFICATE OF SERVICE**

      I certify that a copy of the attached Sentencing Memorandum was served upon all counsel of record, by electronic filing, on December 9, 2025.

_____/s/_____

HOPE C. LEFEBER